1

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)

2

James A. Lowe (SBN 214383)
18400 Von Karman, Suite 300

3

Irvine, California 92612
Telephone: (949) 553-1010

4

Facsimile: (949) 553-2050
info@gauntlettlaw.com

5

jal@gauntlettlaw.com

6

Attorneys for Plaintiff
CRISP ENTERPRISES, INC.

7

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

## SOUTHERN DIVISION

11

CRISP ENTERPRISES, INC. dba C2      ) Case No.:
REPROGRAPHICS, a California         )

12

corporation,                       )
                                   ) **COMPLAINT FOR DECLARATORY**

13

          Plaintiff,               ) **RELIEF ON DEFENDANT'S DUTY**
                                   ) **TO DEFEND**

14

     vs.                           )
                                   )

15

GOLDEN EAGLE INSURANCE             )
COMPANY, a Massachusetts corporation, )

16

                                   )
          Defendant.               )

17

                                   )
                                   )

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Crisp Enterprises, Inc., dba C2 Reprographics ("C2") files this Complaint for declaratory relief against its general liability insurer, Defendant Golden Eagle Insurance Company ("Golden Eagle") based on its failure and refusal to pay policy benefits to and defend C2 in the action styled *American Reprographics Company, LLC, v. Crisp Enterprises, Inc., dba C2 Reprographics*, Case No. 30-2013-00628051-CU-IP-CJC, Superior Court of California, Orange County, Central Justice Center ("*ARC suit*").

In the *ARC suit*, the plaintiff American Reprographics Company, LLC ("ARC") alleged, *inter alia*, that the defendant C2, together with co-defendant Bryan Stinson, engaged in unlawful and anti-competitive practices by using ARC's confidential information to promote C2's business and solicit new customers to C2. ARC sought damages from C2 for alleged conduct that was injurious to ARC because it caused ARC customers to prefer C2 to it. Golden Eagle was obligated to provide a defense for the *ARC suit* on behalf of C2 but refused to do so, causing damage to C2. The Complaint in the *ARC suit* alleged that C2 solicited ARC's customers to give their business to C2. ARC's witnesses explained that C2's solicitations created a negative perception that ARC was a poor value and that C2 made misrepresentations that caused its customers to be dissatisfied with ARC.

The allegations about C2's conduct are sufficient to establish a potential for coverage under the insurance policy's "personal injury" offense (d) – "Oral or written publication . . . of material that . . . disparages a person's or organization's goods, products or services" - thus triggering Golden Eagle's duty to defend under the policy.

## THE PARTIES

1.    Plaintiff C2 is a California corporation with its principal place of business in Costa Mesa, California. C2 is a citizen of California.

2.    Defendant Golden Eagle is a Massachusetts corporation, with its principal place of business located in Johnstown, Ohio. C2 alleges that Golden Eagle is a citizen of Ohio.

## JURISDICTION

3.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties.

4.     The amount in controversy is in excess of $75,000, exclusive of interest and costs, in that C2 has already incurred more than $75,000 in defense expenses in the *ARC suit*. C2 seeks reimbursement of all defense expenses in the *ARC suit*.

## VENUE AND APPLICABLE LAW

5.     Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(a)–(d) in that the underlying action for which C2 seeks a defense, the *ARC suit*, is pending in Orange County Superior Court within this District, and Golden Eagle does business within this District and owes its insured a defense in this District

6.     Golden Eagle is authorized to and does issue insurance policies in California and defends lawsuits in California, including in this District. Golden Eagle has sufficient contacts with California to be subject to personal jurisdiction in this District.

7.     Golden Eagle sold and issued its insurance policy to C2 in this District.

8.     The insurance policy issued by Golden Eagle was intended to cover C2's operations in California, including in this District.

9.     This District is the place of performance under the Policy and California law governs Golden Eagle's obligations to C2.

## THE GOLDEN EAGLE INSURANCE POLICIES

10.     Golden Eagle issued to C2, as the named insured, a general liability policy, number CBP 8651490 for the period May 10, 2009 to May 10, 2013 which includes primary Commercial General Liability Coverage Form Number CG0001-1001 (the "Policy"). A copy of the Policy for May 10, 2012 to May 10, 2013 is attached as **Exhibit "1."**

11.   The Policy provides general liability coverage for "personal and advertising injury" caused by an offense committed during the policy period and promises a defense of suits potentially falling within this coverage.

12.   The Policy has a limit of $1,000,000 for "personal injury" and "advertising injury" that occurs during the policy period.

13.   The Commercial General Liability Coverage Form of the Policy provides in pertinent part:

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.   Insuring Agreement**

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .

. . . .

b.   This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period. . . .

. . . .

**SECTION V - DEFINITIONS**

1.   "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the

purpose of attracting customers or supporters. . . .

. . . .

4.   "Coverage territory" means:

    a. The United States of America …

    . . . .

14. "Personal and advertising injury" means injury . . . arising out of one or more of the following offenses. . . .

    . . . .

    d.    Oral or written publication, in any manner, of material that . . . disparages a person's or organization's goods, products or services . . . .

14.    The Policy also includes exclusions which state:

    This insurance does not apply to "Personal and advertising injury" . . . .

    **a.**    **Knowing Violation Of Rights Of Another**

        . . . . caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

    . . . .

    **e.**    **Contractual Liability**

        . . . . for which the insured has assumed liability in a contract or agreement. . . .

    **f.**    **Breach of Contract**

        . . . . arising out of a breach of contract. . . .

    . . . .

    **i.**    **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

1   . . . . arising out of the infringement of
2   copyright, patent, trademark, trade secret or
3   other intellectual property rights. . . .

4   **THE UNDERLYING *ARC SUIT***

5   15.    On February 1, 2013, ARC filed a Complaint in the Superior Court of
6   California, Orange County, Central Justice Center, against C2 and Bryan Stinson, an
7   individual. A copy of the *ARC suit* Complaint filed on February 1, 2013, is attached as
8   **Exhibit "2."** This Complaint alleged five causes of action and included one exhibit.

9   16.    The *ARC* Complaint alleged a cause of action for "Interference with
10  Prospective Economic Relations" (Count III against Stinson and C2). **[Ex. 2]**

11  17.    The *ARC* Complaint alleged that a former ARC employee, Stinson, was
12  hired by C2 and used "ARC Confidential Information . . . to contact and solicit ARC
13  customers in order to induce them to cease their business with ARC and transfer it to .
14  . . C2." **[Ex. 2, ¶¶9, 11]** ARC alleges C2 used its information for C2's benefit "for the
15  purpose of expanding [C2's] business at the expense of ARC." **[Ex. 2, ¶34]** ARC
16  alleges that C2's actions were calculated to usurp ARC's business and cause harm to
17  ARC while benefitting itself. **[Ex. 2, ¶13]**

18  18.    The *ARC* Complaint also alleges that C2 "must be precluded from
19  continuing to use ARC's Confidential Information to sell C2 services and products to
20  ARC customers" **[Ex. 2, ¶39]** and that Stinson was "surreptitiously absconding with
21  information related to ARC's customer lists for the purpose of attaining an unfair
22  competitive advantage." **[Ex. 2, ¶53]**

23  19.    The foregoing allegations in the *ARC* Complaint thereby contend that
24  ARC lost customers as a consequence of C2's interaction with ARC's existing or
25  prospective customers, and that C2 relied on ARC's information in procuring them.
26  These allegations lead to the reasonable inference that C2 communicated with ARC's
27  customers in a manner that led those customers to prefer C2 to ARC.

28  20.    Implicit in these allegations, as clarified by deposition testimony made

known to Golden Eagle before it confirmed its refusal to defend C2, is ARC's claim that C2 used ARC's information to communicate with ARC's customers in a manner that enhanced C2's business while diminishing ARC, leading ARC to appear a less viable business partner and thereby disparaging it.

21.    The *ARC* Complaint, therefore, alleges a potentially covered claim of "disparagement" implicating potential coverage under offense (d) of Golden Eagle's policy.

22.    By this action, C2 seeks reimbursement for all costs of defense of the *ARC suit* that were validated as reasonable by the trial court but not fully reimbursed following a compromise of settlement of the *ARC suit* while the appeal was pending.

### TENDER OF THE *ARC SUIT* TO GOLDEN EAGLE

23.    C2 provided notice of the potential *ARC suit* to Golden Eagle on November 20, 2012 (the "November notice"). The November notice to Golden Eagle included pre-litigation letters from ARC threatening a lawsuit. The notice satisfied the notice provisions of the Policy. A copy of the November notice is attached as **Exhibit "3."**

24.    On November 21, 2012, Golden Eagle acknowledged receipt of C2's claim for coverage. A copy of the acknowledgement is attached as **Exhibit "4."**

25.    After the filing of the *ARC suit* on February 1, 2013, Golden Eagle denied coverage of the *ARC suit* by letter dated March 27, 2013. A copy of that denial letter is attached as **Exhibit "5."**

26.    C2 sought reconsideration of Golden Eagle's denial by letter dated March 18, 2014, and also informed it of its obligations to defend C2 from ARC's allegations of disparagement. A copy of the letter is attached as **Exhibit "6."**

27.    C2 provided further information for use by Golden Eagle in its reconsideration by letter dated April 1, 2014. A copy of the letter is attached as **Exhibit "7."**

28.    Golden Eagle again denied coverage of the *ARC suit* by letter dated April

1    18, 2014. A copy of that denial letter is attached as **Exhibit "8."**

2        29.    In refusing to find potential coverage for "disparagement" under offense

3    (d), the most recent denial letter relied upon Golden Eagle's contention that there were

4    no false statements about ARC alleged to have been made by C2 in the *ARC suit*, and

5    that coverage exclusions for the "knowing violation of rights of another," "contractual

6    liability," "breach of contract" and "infringement of intellectual property" barred any

7    defense to ARC's allegations. **[Ex. 8, p. 3]**

8        30.    Golden Eagle offered no factual support to explain why these exclusions

9    were applicable to bar potential coverage for the potentially covered claims of

10   "disparagement" despite applicable case authority requiring that it specify the factual

11   basis for such claims with sufficient particularity that C2 would be apprised of the

12   basis for its denial.  Golden Eagle also ignored pertinent case authority that clarified

13   that tortious interference claims implicated coverage for claims of implicit

14   disparagement like that asserted here as that tort is but a remedy for underlying

15   tortious acts which must be factually developed.  Numerous coverage decisions have

16   readily concluded that claims for "disparagement" are nested under asserted liability

17   for tortious interference.

18       31.    Golden Eagle's denial letter, however, conceded that C2 was "alleged to

19   have falsely associated [itself] with ARC" and that C2 allegedly attempted "to solicit

20   new business from ARC's customers" and "[i]n doing so, C2 and Stinson allegedly

21   associated themselves with ARC in a purported attempt to acquire value from ARC's

22   'high quality brand'. . . .to 'steer' customers to [C2's] product." **[Ex. 8, pp. 3-4]**

23       32.    Golden Eagle had ample opportunity to evaluate the deposition testimony

24   set forth in the depositions of ARC's executives evidencing allegations of

25   disparagement therein before affirming its self-aggrandizing conclusion that there was

26   no duty to defend for claims of implicit disparagement.

27       33.    Golden Eagle's selective reference to only some of the deposition

28   testimony in its denial letter is incomplete and failed to ensure that Golden Eagle has

1  eliminated any possibility of a defense "in all possible worlds," as required by
2  applicable California coverage law.

### ALLEGATIONS OF IMPLICIT DISPARAGEMENT ESTABLISH A POTENTIAL FOR COVERAGE UNDER OFFENSE (d)

### A Three-Element Test Applies to This Offense

6  34.    The Policy defines "personal and advertising injury" as having three
7  elements relevant here: (1) "injury . . . arising out of"; (2) "oral or written publication,
8  in any manner, of material"; (3) "that. . . . disparages a person's or organization's
9  goods, products or services."

10  35.    Each of the three elements described in the preceding paragraph are
11  potentially met by the allegations of the *ARC* Complaint, particularly claims that: (a)
12  C2's alleged conduct was the cause of injury to ARC; (b) publication of material that
13  adversely impacted ARC's reputation; and (c) C2's alleged conduct implicitly
14  disparaged ARC by claiming equivalence, if not superior performance when
15  communicating with ARC customers to induce them to choose ARC over C2, thereby
16  triggering Golden Eagle's duty to defend C2.

### Element One Is Met: "Injury Arising Out Of" Offense (d)

18  36.    The Policy defines "personal and advertising injury" as any "injury . . .
19  arising out of" a listed *offense*.

20  37.    "Arising out of," as used in the definition of "personal and advertising
21  injury," is undefined in the Policy and is a term of much broader significance than
22  "caused by." The term "arising out of" means "originating from," "having its origin
23  in," "growing out of," "flowing from," "incident to," or "having connection with."

24  38.    The "injury arising out of" element is met in the *ARC* Complaint by the
25  allegation that C2's actions were "calculated to usurp ARC's business relationships
26  with its customers, and to thereby both cause severe monetary harm to ARC while
27  financially benefitting" itself. **[Ex. 2, ¶13]**

28  39.    Therefore the injury alleged in the underlying case potentially "arises out

of" offense (d).

## Element Two Is Met: "Oral or Written Publication of Material"

40.    The term "publication" is undefined in the Policy. "Publication" is generally defined as "the act of bringing before the public" or an "announcement." The word "announce" is defined as "to make known . . . " or "to state; declare." An allegation of "publication," as defined, requires only one recipient of the "announcement" to exist.

41.    The *ARC* Complaint alleges that the defendants used "ARC Confidential Information . . . to contact and solicit ARC customers in order to induce them to cease their business with ARC and transfer it to . . . C2."  **[Ex. 2, ¶11]** ARC's complaint further contended that C2 sent out "solicitations for business to ARC's customers" . . . **[Ex. 2, ¶12]**

42.    "Contact" is defined as "to communicate with." "Solicit" is defined as "to seek to influence or incite to action. . . ."

43.    The *ARC* Complaint further alleges the "disclosing" of information for the benefit of C2. **[Ex. 2, ¶25]** "Disclose" generally means "to make known." It is reasonable to infer from ARC's allegation of "disclosing" information its contention that C2 made such information known through the communication of words to at least one individual.

44.    The foregoing allegations of "contact and solicit" and of "disclosing" information, in the *ARC* Complaint, necessarily imply that C2 made a "publication" to at least one ARC customer. Golden Eagle's denial letter does not dispute this contention.

45.    During the *ARC suit*, testimony was obtained from several ARC executives including Ross Banks and John Toth. Transcripts of the pertinent parts of their testimony were supplied to Golden Eagle in C2's reconsideration letter of March 18, 2014**. [Ex. 6]** The Toth testimony, although initially marked confidential pursuant to the protective order in the *ARC suit*, is no longer confidential pursuant to written

agreement between the parties.

46.     When asked if C2 had done anything to change the perception of ARC customers about ARC's products and services, Mr. Toth testified that C2 "sent out letters that associate themselves with ARC" and that C2 had sent "201" such letters using ARC's "customer list." Mr. Toth's response expands upon the *ARC* Complaint's allegations by clarifying that ARC alleged C2's communication of information to more than two hundred individuals. Thus, ARC necessarily contended that C2 published information, or "misinformation," to ARC customers.

47.     As C2 "published" material (which C2 contends potentially disparaged ARC) by broadly disseminating it as part of C2's marketing activities and through communicating negative comparative information to numerous ARC customers, ARC's allegations that there were multiple contacts of customers by C2 in its complaint and supporting testimony evidence that the element of an "oral or written publication" was met by the claims asserted in the *ARC* Complaint.

**Element Three Is Met: "Disparages a Person's or Organization's Goods, Products or Services"**

**Definition of "Disparagement"**

48.     "Disparagement" is generally defined as "statements about a competitor's goods that are untrue or misleading, or that are made to influence potential purchasers not to buy from that competitor." It includes statements about a competitor that suggest "equivalence," as well as "superiority," where they give rise to negative comparative inferences. Several California courts have acknowledged implicit disparagement arises where the comparison of features between competitors' products or services is "an 'important differentiator' between two competing products [and services] even though some competitors offered products with those exact features."

**Disparagement by Inference of Claimed Product or Service Equivalence**

49.     Toth testified that C2 "sent out letters that associate themselves with ARC…." He also confirmed that C2's obtaining the customer list and sending out

letters to customers on the list was an attempt to acquire value from the ARC brand and was a misuse of the brand.

50.    During his deposition, Toth accused C2 of "trading on our name." Toth questioned Stinson's references to ARC because they denigrated ARC by leading customers to believe that ARC's quality was comparable to C2 when it, in fact, was much higher quality. Toth stated that "[W]e work hard to deliver a high quality service, great value. And they're associating themselves with us and they're implying that they're bringing that quality to C2. And I resent that, because they're not."

**Disparagement by Inference of Claimed Product or Service Superiority**

51.    The *ARC* Complaint alleged that a former ARC employee, Stinson, was hired by C2 and used "ARC Confidential Information . . . to contact and solicit ARC customers in order to induce them to cease their business with ARC and transfer it to . . . C2." **[Ex. 2, ¶¶9, 11]** ARC alleges C2 used its information for C2's benefit "for the purpose of expanding [C2's] business at the expense of ARC." **[Ex. 2, ¶34]** ARC alleges that C2's actions were calculated to usurp ARC's business and cause harm to ARC while benefitting itself. **[Ex. 2, ¶13]**

52.    Toth testified that if a customer were to transfer its business from ARC to a competitor it would be because of a perception that the competitor offers a better solution and value and that ARC's service is not what they want. Toth then accused C2 of denigrating ARC by creating just such a perception that C2 offers a better value than ARC. When asked if C2 had done anything to change the perception of ARC customers such that they believe that C2 offers a better value of some sort than ARC, Toth stated **"Yes"** and explained that C2 stole customer lists, and sent out over 200 letters associating themselves with ARC.

53.    Banks' deposition testimony directly referenced disparaging misrepresentations about ARC by C2. When asked if Stinson did something to cause a customer to be upset with ARC but be happy with C2 and provide their business to C2, Banks replied "Yes."

54.     When asked "does that have something to do with believing that there was misinformation given to the customer with respect to ARC in order to entice the customer to provide business to C2," Banks confirmed "Yes."

55.     When asked what information Stinson or C2 provided to the customers, Banks answered "I do not know the particulars. They were just dissatisfied and felt misrepresented of the products and services that they were committed to [with ARC]."

56.     Banks claimed that Stinson was doing something to sabotage the relationship between ARC and its customer, Clerkin & Clerkin, and that ARC believed he could be doing it with other customers as well.

57.     Banks alleged that as a result of this activity, one of ARC's customers believed that ARC "did not meet their expectations." Banks stated that his understanding was Stinson's representations were "not a representation of what [the customer] expected and within the confines of what we would normally provide a client."

58.     Mr. Stinson as an employee of C2, therefore, allegedly impugned ARC's reputation when comparing its services to those of C2. This denigration of ARC in the mind of both existing and potential customers of ARC in favor of C2 evidences "disparagement" within the meaning of offense (d) in the Policy.

59.     The foregoing testimony highlighted the similarity of the competitor's products and services offered through the same sales representations that ARC customers had previously enjoyed albeit at more competitive pricing by C2.

60.     The fact allegations in the *ARC* Complaint, as clarified by deposition testimony, reveal that ARC claimed its products/services were being impugned by its prior employee, Stinson, in soliciting his prior customers when working for C2.

61.     The inferences properly drawn from the fact allegations of the *ARC* Complaint as clarified by deposition testimony evidence disparagement because: **(1)** ARC's products and services are directly compared with C2's products in an unfavorable manner; **(2)** customers are encouraged to prefer C2 products to ARC by

what ARC characterized as misrepresentations regarding services of ARC; and **(3)** doubts are cast into the customers' minds about ARC's suitability as a source of services for precisely what Stinson was offering when he was previously affiliated with ARC, therefore, trading upon the credibility he developed as an ARC employee and of the good will of ARC to its disadvantage and to the benefit of C2.

62.     The fact that the *ARC Action* does not specifically allege a disparagement cause of action is of no moment in finding potential coverage for *implied* disparagement

63.     To the extent there is any *factual* dispute about what occurred that would evidence disparagement, that possibility alone triggers a duty to defend.

64.     Golden Eagle fails to acknowledge that where a claimant such as ARC sought to avoid articulating with more specificity, facts supportive of its general theories of disparaging conduct as a form of subterfuge motivated by ARC's confrontation of insurance for C2 in prior litigation. The presumption arises that the fact allegations evidencing potential covered claims, here for "disparagement," might be broadly construed in the insured's favor as they more readily evidence a duty to defend.

## NO EXCLUSIONS BAR COVERAGE

65.     Golden Eagle is relieved of its duty to defend if and only if the allegations in the *ARC suit* allege injury that is not covered under the Policy.

66.     The pertinent Policy language requires the allegation of a "[p]ersonal and advertising injury" for any exclusion to apply. "Personal and advertising injury" is defined in the Policy as including one of the operative offenses. Here, that offense is "disparagement." The only conduct to which the Policy exclusions can possibly apply are those allegations as clarified by extrinsic evidence known to Golden Eagle Insurance Company.

67.     Courts have found that if a claimant's allegation is not within the scope of coverage, the exclusions cannot apply to it. "Before even considering exclusions, a

court must examine the coverage provisions to determine whether a claim falls within the policy terms."

68.     Golden Eagle has the burden of showing that the allegations cast the *ARC Complaint* solely and entirely within the policy exclusions because its duty to defend is triggered by the mere *possibility* of a covered liability. Golden Eagle cannot conclusively disprove the potential for coverage by merely asserting exclusions. It must show that each potential ground for liability fits conclusively within an exclusion.

69.     Exclusions are construed narrowly and must be proven by the insurer. If coverage is in doubt, Golden Eagle is obligated to defend C2.

70.     Golden Eagle's denial letter contended that the Policy's exclusions for "knowing violation of rights of another," "contractual liability," "breach of contact," and "intellectual property" preclude its duty to defend C2. **[Ex. 8, p. 5]**

## Knowing Personal and Advertising Injury

71.     Proof of disparagement based on publication of material that denigrates C2's competitor need not be proven to be intentional to establish liability, much less undertaken knowingly with an intent to injure the party disparaged so that such allegations here are not sufficient to evidence "knowing 'personal or advertising'" injury. Thus, the "knowing violation" exclusion is inapplicable.

## Contractual Liability

72.     The *ARC suit* claims revealing "disparagement" do not allege that C2 "has assumed liability in a contract or agreement." Further, the exclusion for "contractual liability" includes an exception as "to liability for damages that the insured would have in the absence of the contract or agreement." Thus, even if it was alleged that C2 had assumed contractual liability, an exception to the exclusion would exist because C2 would be independently liable for disparagement in the absence of such a contract.

/ / /

**Breach of Contract**

73.     Similarly, fact allegations evidencing potential "disparagement" do not depend for proof of liability on the existence, or breach, of any contract. ARC's allegations of disparagement would independently exist regardless of whether there was any breach of contract by C2 or Stinson. The "breach of contract" exclusion is inapplicable.

**Intellectual Property**

74.     The alleged offense of disparagement is not a claim "arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights." Rather, it asserts a publication by C2 that harms the reputation of ARC, as a competitor, in a manner wholly independent of ARC's intellectual property rights. The "intellectual property" exclusion is inapplicable.

## FIRST CAUSE OF ACTION

### Declaratory Relief – Duty to Defend

75.     C2 incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

76.     A valid contract existed between C2 and Golden Eagle, namely the Policy.

77.     C2 fully performed all of the obligations and conditions to be performed by it under the Policy or has been excused from performing same as a result of Golden Eagle's breach of its duty to defend.

78.     By selling the Policy Golden Eagle agreed to provide a defense to its insureds in suits seeking damages for "personal and advertising injury" offenses as defined in its Policy.

79.     The underlying *ARC suit* Complaint alleges facts potentially implicating coverage under the Policy as "personal and advertising injury" thereby triggering Golden Eagle's obligation to defend C2 in the *ARC suit*.

80.     Golden Eagle wrongfully denied a defense, denying Policy benefits to

C2.

81.     An actual bona fide controversy exists between C2, on the one hand, and Golden Eagle, on the other hand, that requires judicial declaration by this Court of the parties' rights and duties regarding Golden Eagle's duty to defend C2 in the *ARC suit*, and a determination of the amount of defense expenses owed by Golden Eagle.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff C2 prays for judgment against Defendant Golden Eagle as follows:

1.     A judicial declaration that Golden Eagle had a duty to defend C2 in the *ARC suit* under the Policy it issued to C2;

2.     A determination and award of general damages consisting of all reasonable defense expenses incurred by C2 in defense of the *ARC suit*;

3.     Award of Pre-judgment interest from the date of each defense invoice at the statutory rate of 10% per annum;

4.     Award of costs of suit herein; and

5.     Other and further relief as this Court may deem just and proper.

Dated: December 2, 2015                    **GAUNTLETT & ASSOCIATES**


By:   *s/David A. Gauntlett*
      David A. Gauntlett
      James A. Lowe

      Attorneys for Plaintiff
      CRISP ENTERPRISES, INC.

1

# **EXHIBITS TO COMPLAINT**

2

3   **EXHIBIT "1" --**   Commercial General Liability Policy No. CBP 8651490 issued by Golden Eagle for the period May 10, 2009 to May 10, 2013

4

5   **EXHIBIT "2" --**   ARC's original Complaint and Exhibit filed in underlying action on February 1, 2013

6   **EXHIBIT "3" --**   C2's email to its insurance broker instructing him to tender the ARC claim and the broker's email tendering the ARC claim to Golden Eagle both dated November 20, 2012

7

8   **EXHIBIT "4" --**   Golden Eagle's acknowledgement of claim dated November 21, 2012

9

10   **EXHIBIT "5" --**   Golden Eagle's coverage denial letter of March 27, 2013

11   **EXHIBIT "6" --**   C2's letter of March 18, 2014 seeking Golden Eagle's reconsideration of coverage denial (without attached exhibits)

12   **EXHIBIT "7" --**   C2's letter of April 1, 2014 to Golden Eagle updating reasons for reconsideration of coverage denial

13

14   **EXHIBIT "8" --**   Golden Eagle's coverage denial letter of April 18, 2014

15

16

17

18

19

20

21

22

23

24

25

26

27

28